RECEIVED ___ COPY

FILED ___ LODGED

JUN 0 5 2006

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

___ FILED      ___ LODGED
___ RECEIVED   ___ COPY

JAN 3 0 2008

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ Z DEPUTY

PAUL K. CHARLTON
United States Attorney
District of Arizona

Howard d. Sukenic
Assistant U.S. Attorney
Two Renaissance Square
40 N. Central Avenue, Suite 1200
Phoenix, Arizona 85004-4408
Arizona State Bar No. 011990
Telephone (602) 514-7500

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>        Plaintiff,<br><br>   v.<br><br>Angelo S. Tullo,<br><br>        Defendant. | CR-04-0539-PHX-MHM<br><br>**PLEA AGREEMENT**<br><br>Cooperation/Testimony Required |

Plaintiff, United States of America, and defendant, Angelo S. Tullo, hereby agree to the following disposition of this matter:

### PLEA

Defendant will plead guilty to Count 1 of the Indictment charging defendant with Conspiracy, a violation of Title 18, United States Code, Section 371, a Class D felony offense.

### TERMS

Defendant understands that the Court is required to consider the United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") among other factors in determining defendant's sentence. Defendant understands, however, that the Sentencing Guidelines are only advisory, and that after considering the Sentencing Guidelines, the Court may be free to exercise its discretion to impose any reasonable sentence up to the maximum set by statute for the crimes of conviction.

**Maximum Penalties**

     a.     A violation of Title 18, United States Code, Section 371, is punishable by a maximum fine of $250,000.00, a maximum term of imprisonment of 5 years, or both and a term of supervised release of 3 years.

     b.     According to the Sentencing Guidelines issued pursuant to the Sentencing Reform Act of 1984, the court shall:

     (1)     Order the defendant to make restitution to any victim of the offense unless, pursuant to Title 18, United States Code, Section 3663, the court determines that restitution would not be appropriate in this case;

     (2)     Order the defendant to pay a fine, which may include the costs of probation, supervised release or incarceration, unless, pursuant to Title 18, United States Code, Section 3611, the defendant establishes the applicability of the exceptions found therein;

     (3)     Order the defendant, pursuant to Title 18, United States Code, Section 3583, to serve a term of supervised release when required by statute or when a sentence of imprisonment of more than one year is imposed, and the court may impose a term of supervised release in all other cases.

     c.     Pursuant to Title 18, United States Code, Section 3013, the court is required to impose a special assessment on the defendant of $100.00. The special assessment is due at the time the defendant enters the plea of guilty, but in no event shall it be paid later than the time of sentencing.

**2.     Cooperation Required**

     The defendant will cooperate with the United States on the following terms and conditions.

     a.     Defendant will waive the Fifth Amendment privilege against self-incrimination and will provide information in an interview(s) and testify completely and truthfully at any time and any place requested by the United States, including at any state or federal grand jury

1   proceeding, forfeiture proceeding, bond hearing, pretrial hearing, civil and criminal trial, retrial

2   or post-trial hearing.

3       b.   All such information and testimony shall be truthful, honest, candid, and complete

4   with no knowing material false statements or omissions. Such information and testimony shall

5   include all criminal activity known to the defendant including the criminal activity alleged in the

6   Indictment in this matter and specifically, but not limited to, the criminal conduct of co-

7   defendant Margaret Molter.

8       c.   Defendant will be available for interviews by attorneys and law enforcement

9   officers from the government upon request and reasonable notice.

10      d.   Defendant will provide the United States with all documents, records, memoranda

11  and the like, at the request of the United States, within the defendant's custody and control or to

12  which the defendant has access which are related to the subject matter of this investigation or

13  case.

14      e.   Defendant will neither attempt to protect any person or entity through false

15  information or omissions nor falsely implicate any person or entity.

16      f.   Defendant agrees to notify the United States Attorney's Office of any contacts with

17  any co-defendants, excepting Margaret Molter, or subjects or targets of the investigation, or their

18  counsel, and agrees to provide prior notice of, and an opportunity for the government to be

19  present at, any interviews between the defendant and any individual not employed by the

20  government regarding any matter related to this case or investigation.

21      g.   In the event the defendant or the defendant's family is harassed, threatened or

22  otherwise subjected to intimidation because of defendant's cooperation, the United States shall

23  in its complete discretion, take appropriate action to protect defendant and the defendant's

24  family.

25      h.   Nothing in this agreement requires the United States to accept any cooperation or

26  assistance the defendant may choose to proffer. The decision whether and how to use any

27

28

3

1  information and/or cooperation that defendant provides is in the exclusive reasonable discretion

2  of this office.

3       i.    Defendant will not violate any local, state, federal or foreign criminal laws.

4       j.    Defendant shall not knowingly contact any person who has been criminally

5  charged in any forum, except for co-defendant Margaret Molter and any family members of the

6  defendant regarding innocent family matters.

7       k.    Nothing shall limit the United States' methods of verifying the truthfulness of

8  defendant's statements. The United States may confirm the accuracy of any information which

9  defendant provides under the terms of this agreement by use of any investigative means which

10  it deems appropriate and necessary. Whether there has been a complete, truthful and candid

11  disclosure by the defendant will be evaluated and decided by the United States Attorney for the

12  District of Arizona and by him alone.

13  **3.**    **Agreements Regarding Sentencing**

14       a.    <u>Recommendation By The Government For Cooperation</u>

15      At the conclusion of defendant's cooperation, pursuant to this agreement, the United

16  States will in its sole discretion, at the time of sentencing, move pursuant to Title 18, United

17  States Code, Section 3553(e), and Title 28, United States Code, Section 994(n) that the court

18  depart from the Guidelines and impose a sentence below a level established by law as the

19  minimum sentence to reflect defendant's substantial assistance in the investigation and

20  prosecution. The United States' recommendation of a sentence below the minimum guidelines

21  will be made based upon factors set forth in United States Sentencing Guidelines Section 5K1.1.

22  The government agrees that if defendant provides substantial assistance and complies with the

23  provisions of this agreement, the government will recommend, pursuant to Rule 11(C)(1)(B) of

24  the Federal Rules of Criminal Procedure, a reduction of six Offense Levels and a sentence in the

25  low end of the Guideline range.

26

27

28

1   Defendant understands that while the court may take the defendant's cooperation into
2   account in determining the sentence to be imposed, the court is neither a party to nor bound by
3   this agreement and specifically the court has complete discretion to impose the maximum
4   sentence possible for the crime to which defendant has plead.  Defendant further understands
5   that if the court imposes a sentence different from what the United States recommends, the
6   defendant will not be permitted to withdraw the guilty plea.

7       b.   <u>Stipulation As To Loss Amount</u>

8   Pursuant to Rule 11(c)(1)© of the Federal Rules of Criminal Procedure, the government
9   and the defendant stipulate that the amount of loss for Guideline calculation purposes is limited
10  to the amount that the defendant personally received as proceeds from his participation in the
11  criminal activity.  The stipulated range reflecting this amount is between $400,000 to
12  $1,000,000. The government and the defendant agree that this range does not control the amount
13  of restitution owed by the defendant and that the restitution amount may be considerably higher.

14      c.   <u>Other Agreements</u>

15  The government agrees to take no position, and leaves to the discretion of the court,
16  the addition of any Guideline sentencing enhancements that may apply to increase the
17  defendant's Offense Level as to the following:

18      1.  More than minimal planning/sophisticated means.
19      2.  Aggravating Role in the Offense[1].

20  The government however, is not restricted  from presenting evidence that may cause
21  this Court to consider and/or apply these enhancements.

22  The government and defendant Tullo also agree that this plea agreement shall be void
23  unless co-defendant Margaret Molter enters her plea of guilty on the same date and
24  approximately the same time as defendant Tullo.

25

26  ――――――――――――

27  [1] The government agrees that during the course of the criminal conspiracy, that defendant
Tullo participated in, his direct supervision and control was limited to co-conspirators Allan
28  Guttentag, John R. Wolfe and Margaret Molter.

5

If the court, after reviewing the plea agreement, concludes that any provision is inappropriate, it may reject the plea agreement giving the defendant, in accordance with Fed. R. Crim. P. 11(c)(5), an opportunity to withdraw the guilty plea.

The United States will bring the nature and extent of defendant's cooperation to the attention of the Court, and the Bureau of Prisons, if applicable, at sentencing and any other appropriate time.  The United States retains the unrestricted right to make any and all statements it deems appropriate to the Probation Office and to make factual and legal responses to any statements made by the defendant or defense counsel or objections to the presentence report or to questions by the court at the time of sentencing.

Assuming the defendant makes full and complete disclosure to the Probation Department of the circumstances surrounding the defendant's commission of the offense and, if the defendant demonstrates an acceptance of responsibility for this offense up to and including the time of sentencing, the United States will recommend the applicable reduction as set forth in the advisory sentence guideline offense level, pursuant to Section 3E1.1 of the Guidelines.

**4.      Breach of the Agreement**

If the defendant fails to comply with any obligation or promise pursuant to this agreement, the United States:

(1)     may, in its sole discretion, declare any provision of this agreement null and void in accordance with paragraph (6) below and the defendant understands that the defendant will not be permitted to withdraw the plea of guilty made in connection with this agreement;

(2)     may prosecute the defendant for any offense known to the United States for which the defendant is responsible, and defendant waives any statute of limitations, Speedy Trial Act, and constitutional restrictions for bringing charges after the execution of this agreement;

(3)     may argue for a maximum statutory sentence for the offenses to which defendant has pled guilty;

(4)     may use in any prosecution any information, statements, documents, and evidence provided by defendant both before and after the plea agreement including derivative evidence;

(5)     may advise the Bureau of Prisons that defendant is no longer a cooperating witness, and recommend redesignation of defendant to a higher custodial level.

(6)     If there is a dispute regarding the obligations of the parties under this agreement, the United States District Court shall determine whether the United States or the defendant has failed to comply with this agreement including whether the defendant has been truthful.

**5.     Agreement to Make Restitution**

Defendant specifically agrees to make restitution, as to all counts listed in the Indictment, pertaining to this defendant, in an amount to be determined at the time of sentencing.  The parties agree that the amount of restitution is limited to that amount which has previously been agreed to, and paid pursuant to the agreement, in the civil and/or bankruptcy litigation concerning the same facts upon which the indictment is based.  Those agreements are attached hereto as Exhibit A.

**6.     Agreement to Dismiss or Not to Prosecute**

Pursuant to Fed. R. Crim. P. 11(c)(1)(A), the United States will dismiss Counts 2-29 of the Indictment and the Criminal Forfeiture allegation of the Indictment as to this defendant only.

a.     This agreement does not, in any manner, restrict the actions of the United States in any other district nor bind any other United States Attorney's Office.

**7.     Waiver of Defenses and Appeal Rights**

The defendant waives any and all motions, defenses, probable cause determinations, and objections which the defendant could assert to the indictment or information or to the

1    Court's entry of judgment against the defendant and imposition of sentence upon the

2    defendant, providing the sentence is consistent with this agreement.  The defendant further

3    waives: (1) any right to appeal the Court's entry of judgment against defendant; (2) any right

4    to appeal the imposition of sentence upon defendant under Title 18, United States Code,

5    Section 3742 (sentence appeals); and (3) any right to collaterally attack defendant's

6    conviction and sentence under Title 28, United States Code, Section 2255, or any other

7    collateral attack.  The defendant acknowledges that this waiver shall result in the dismissal of

8    any appeal or collateral attack the defendant might file challenging his conviction or sentence

9    in this case.

10   **8.      Perjury and Other False Statement Offenses or Other Offenses**

11          Nothing in this agreement shall be construed to protect the defendant in any way from

12   prosecution for perjury, false declaration or false statement, or any other criminal offense

13   committed by defendant after the date of this agreement.  Any information, statements,

14   documents, and evidence which defendant provides to the United States pursuant to this

15   agreement may be used against the defendant in all such prosecutions.

16   **9.      Reinstitution of Prosecution**

17          If defendant's guilty plea is rejected, withdrawn, vacated, or reversed at any time, the

18   United States  will be free to prosecute the defendant for all charges of which it has

19   knowledge, and any charges that have been dismissed because of this plea agreement will be

20   automatically reinstated.  In such event, defendant waives any objections, motions, or

21   defenses based upon the Statute of Limitations, the Speedy Trial Act or constitutional

22   restrictions in bringing of the later charges or proceedings.  The defendant understands that

23   any statements made at the time of the defendant's change of plea or sentencing may be used

24   against the defendant in any subsequent hearing, trial, or proceeding as permitted by

25   Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410.

26

27

28

**10.     Disclosure of Information to U.S. Probation Office**

The defendant will cooperate fully with the United States Probation Office.  Such cooperation will include truthful statements in response to any questions posed by the Probation Department.

## FACTUAL BASIS

I further admit that if this matter were to proceed to trial the United States could prove the following facts beyond a reasonable doubt:

### Elements of Title 18 U.S.C. § 371:

1.  Beginning, on or about a specific date, and ending, on or about a specific date, there was an agreement between two or more persons to commit at least one crime as charged in the indictment; and

2.  The defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and

3.  One of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

**Facts:**

From on or around September, 1996, to on or around November 1999, in the District of Arizona, and elsewhere, the defendant conspired with co-defendants Allan Guttentag, Gene Monteleone, James Nova, James R. Wolfe, Margaret Molter, and others, to knowingly devise and execute a scheme to defraud and obtain money from investors doing business with ABF.  This scheme involved the use of false and fraudulent pretenses, representations, promises, and the concealment of material facts.  To facilitate the scheme, the defendants employed the use of wire communication and transmission, in interstate and foreign commerce, in violation of Title 18 U.S.C. §1343.

The conspiracy involved, among other things, the creation of fictitious clients and debtors in such a manner that it would attract substantial interest from investors and

significant investment capital. A substantial portion of this investment capital was subsequently and illegally diverted to benefit the defendants.

Defendant Tullo acted as an officer of the entity H.V.A.C. Depot, Inc., ("HVAC") and owned 37 ½ % of American Business Funding ("ABF"). Knowing of the false and illegal acts, as described above and in the indictment, the defendant knowingly participated in this activity, and in furtherance of the conspiracy, engaged in personally, among other things, the following acts:

1. On or about January 12, 1995, defendant Tullo caused HVAC to be incorporated in Arizona.

2. On or about August 26, 1996, defendant Tullo wrote to Mike Nealis of Allstate financial, providing him with a list of HVAC's customers. This list identified Charles Roberts, MMAPS, Wakely Comfort, UF Distribution and GA Beck Investments as HVAC's major account debtors.

3. On or about January 7, 1997, defendants Tullo, Monteleone and Nova caused ABF to be incorporated in Arizona.

4. On or about December 8, 1997, defendant Tullo, anticipating an audit of ABF, instructed co-defendant Guttentag to stamp all checks, issued by ABF to DCS and UF, with fictitious deposit endorsements to mislead the audit and conceal the true flow of the checks.

I understand that I will have to swear under oath to the accuracy of this statement, and if I should be called upon to testify about this matter in the future, any intentional material inconsistencies in my testimony may subject me to additional penalties of perjury or false swearing which may be enforced by the United States under this agreement.

## DEFENDANT'S APPROVAL AND ACCEPTANCE

I have read each of the provisions of the entire plea agreement with the assistance of counsel and understand its provisions.

I have discussed the case and my constitutional and other rights with my attorney.  I understand that by entering my plea of guilty I will be giving up my rights to plead not guilty, to trial by jury, to confront, cross-examine, and compel the attendance of witnesses, to present evidence in my defense, to remain silent and refuse to be a witness against myself by asserting my privilege against self-incrimination -- all with the assistance of counsel -- and to be presumed innocent until proven guilty beyond a reasonable doubt.

I agree to enter my guilty plea as indicated above on the terms and conditions set forth in this agreement.

I have been advised by my attorney of the nature of the charges to which I am entering my guilty plea.  I have further been advised by my attorney of the nature and range of the possible sentence and that my ultimate sentence will be determined after consideration of the advisory Sentencing Guidelines.  I understand that the Guideline Range referred to herein or discussed with my attorney is not binding on the court and is merely an estimate.

My guilty plea is not the result of force, threats, assurances or promises other than the promises contained in this agreement.  I agree to the provisions of this agreement as a voluntary act on my part and I agree to be bound according to its provisions.

I fully understand that, if I am granted probation or placed on supervised release by the court, the terms and conditions of such probation/supervised release are subject to modification at any time. I further understand that, if I violate any of the conditions of my probation/supervised release, my probation/supervised release may be revoked and upon such revocation, notwithstanding any other provision of this agreement, I may be required to serve a term of imprisonment or my sentence may otherwise be altered.

I agree that this written plea agreement contains all the terms and conditions of my plea and that promises made by anyone (including my attorney), and specifically any predictions as to the guideline range applicable, that are not contained within this written plea agreement are without force and effect and are null and void.

I am satisfied that my defense attorney has represented me in a competent manner.

11

I am fully capable of understanding the terms and conditions of this plea agreement. I am not now on or under the influence of any drug, medication, liquor, or other intoxicant or depressant, which would impair my ability to fully understand the terms and conditions of this plea agreement.


5/5/06
Date

Angelo S. Tullo
Defendant

## DEFENSE ATTORNEY'S APPROVAL

I have discussed this case and the plea agreement with my client, in detail and have advised the defendant of all matters within the scope of Fed. R. Crim. P. 11, the constitutional and other rights of an accused, the factual basis for and the nature of the offense to which the guilty plea will be entered, possible defenses, and the consequences of the guilty plea including the maximum statutory sentence possible. I have further discussed the concept of the advisory sentencing guidelines with the defendant. No assurances, promises, or representations have been given to me or to the defendant by the United States or by any of its representatives which are not contained in this written agreement. I concur in the entry of the plea as indicated above and

on the terms and conditions set forth in this agreement as in the best interests of my client. I agree to make a bona fide effort to ensure that the guilty plea is entered in accordance with all the requirements of Fed. R. Crim. P. 11.


5-5-06
Date

Michael Kimerer
Attorney for Defendant

12

1

## UNITED STATES' APPROVAL

I have reviewed this matter and the plea agreement.  I agree on behalf of the United States that the terms and conditions set forth are appropriate and are in the best interests of justice.

PAUL K. CHARLTON
United States Attorney
District of Arizona

_6 / 5/06_____
Date

Howard D. Sukenic
Assistant U.S. Attorney

## COURT'S ACCEPTANCE

_1 - 31 - 08_____
Date

Hon. Mary H. Murguia
United States District Judge

13

# EXHIBIT A

## RECITALS

A.     This Agreement is intended to settle and resolve finally all litigation and claims asserted and assertable by and between the Parties.

B.     NHC and Morris & Miller desire to enter into a separate business transaction.  That transaction is contingent upon this Agreement's approval by the Bankruptcy Court that is presiding over Case No. 00-1782 (the "ABF Bankruptcy Case") and related adversary proceedings.  NHC and Morris & Miller agree that their separate agreement is not subject to Bankruptcy Court approval.

C.     The Parties to this Agreement exchange consideration, including mutual releases, the receipt and sufficiency of which is hereby acknowledged. Nothing in this Agreement, however, should be interpreted as an admission of liability, guilt or wrongdoing by any party to this Agreement.

## RESOLUTION OF LITIGATION

1.     *American Business Funding Corp. v. HVAC Depot, et al.*, Case No. 00-1782/Adv. No. 00-151.

1.1     **Withdrawal of Minute Entry**.  NHC, Molter, Monteleone and Tullo shall jointly prepare and submit to the Court in this matter a sealed, stipulated motion requesting that the Court vacate and withdraw its October 27, 2003 Minute Entry.  Such vacatur and withdrawal is a condition precedent to the settlement closing and the Court may be told of such condition.  This Agreement will be null and void unless the Court grant the relief requested in the motion by December 31, 2003.

1.2     **Entry of Judgments**.  The motion referenced in section 1.1 shall ask the Court to enter judgments against the following individuals and entities in Adv. 00-151:  GRM, Inc. ($128,857.33), MMCB ($561,931.07), Salesmasters ($2,154,238.84), HVAC Depot, Inc. ($2,522,181.50), and Gene Monteleone ($7,000,000.00).  (The judgments entered shall hereinafter be referred to as the "Judgments.")  No judgment shall be entered against Brite Baby USA, Inc., Julia Monteleone, Margaret Molter, Angelo Tullo, Debra Tullo, or Craig Brosnan and they, instead, shall be dismissed from the case, with prejudice, each party to bear their own fees and costs.  The same is true with respect to any other defendant not specifically named in this paragraph. Entry of such Judgments (as well as non-entry of judgments where appropriate under this provision) is a condition precedent to the settlement closing and **all**

**Parties to this Agreement agree to waive any rights of appeal or attack on the judgment entered against them or any other aspect of the proceedings**.

        1.3   **Dismissal**. In the stipulated motion seeking withdrawal of the Minute Entry and entry of the Judgments, the parties shall also request that the Court, after vacating the Minute Entry and entering the Judgments, dismiss the remainder of the matter with prejudice, each party to bear its own fees and costs.

    2.    **Other Federal Court Litigation**.

        2.1   **Bankruptcy Cases**. Promptly upon approval of the stipulation motion in the 00-151 matter, the Parties shall promptly file all requests, motions, stipulations and any other similar paperwork to cause the dismissal, with prejudice, of the following actions:  (a) *NHC v. Tullo*, et al., Adv. No. 02-136; (b) *Morris & Miller v. Monteleone*, Adv. No. 02-255; (c) *Morris & Miller v. Monteleone*, Adv. 02-256; (d) *Tullo, et al. v. Monteleone*, Adv. Nos. 02-260 and 02-261; (e) *NHC v. Monteleone*, Adv. No. 02-621; (f) *NHC v. Performance Funding LLC*, et al., Adv. No. 02-1360; (f) *Morris & Miller v. Atencio*, Adv. No. 01-894; (g) *Morris & Miller v. McIntyre*, Adv. No. 01-895; (h) *Tullo, et al. v. Schaub*, et al., Adv. No. 03-131; (i) *NHC v. Morris & Miller*, et al., Adv. No. 03-686; and *Brosnan v. NHC*, Adv. No. 03-835. The preceding list of cases is meant to include all cases pending in this court arising out of or related to Case No. 00-1782. To the extent any such pending matter has been omitted, that omission is inadvertent and any such matter shall be considered within the scope of this provision. The dismissal paperwork related to the dismissal of these matters shall make clear that each party shall bear its own fees and costs. With respect to Adv. No. 01-895, NHC will obtain Donald McIntrye's stipulation to dismissal.

        2.2   **District Court Cases**. *Angelo Tullo, et al. vs. Ken Schaub, et al.*, CIV 02-0352 PHX-MHM, was removed to Bankruptcy Court and then dismissed by Tullo. The defendants in that case have requested that it be reinstated. NHC represents that it can ensure that the defendants in that case waive their rights in that suit and will not take any action to reinstate said action, and will immediately cause the action to be dismissed with prejudice in the event the action is ever reinstated. Other district court cases that the Parties agree to dismiss include: (a) *Tullo v. Schaub*, CV02-00352; (b) *Morris & Miller v. NHC*, CV02-00365; (c) *Morris & Miller v. Atencio*, CV02-00749; (d) *Morris & Miller v. McIntyre*, CV02-00750; (e) *Morris & Miller v. Atencio*, CV02-01844; and *Morris & Miller v. Monteleone*, CV00-0528 and CV02--00775. The preceding list of cases is meant to include all cases pending in this court arising out of or related to Case No. 00-1782. To the extent any such

1470202.1

pending matter has been omitted, that omission is inadvertent and any such matter shall be considered within the scope of this provision. The district court dismissal papers shall make clear that each party shall bear its own fees and costs. With respect to CV02-00750, NHC will obtain McIntrye's stipulation to dismissal.

   **2.3 Bankruptcy Court Approval.** The Parties agree that it shall be a condition precedent to the Closing of this Agreement that (a) the Bankruptcy Court approve the Agreement, without modification or public hearing; and (b) the approval process be done pursuant to a <u>Sealed</u> Motion to Approve Settlement and Release Agreement (the "Motion"). Should either terms (a) or (b), including the requirement that the motion papers be filed and kept under seal, prove unacceptable to the Bankruptcy Court, then this Agreement shall be voidable and terminable upon written notice by defendants.

   **3. State Court Cases.**

   **3.1 *American Foundation for Charitable Support, et al. v. Tullo*,** CV2001-021716 (Ariz. Super. Ct., Maricopa Cty.) (recently dismissed, without prejudice). Upon entry by the Court in the 00-151 matter of an order granting the relief requested in the stipulated motion (*see* §§ 1.1, 1.2) dismissing that action with prejudice, the plaintiffs in the matter discussed in this paragraph shall promptly file a request that the dismissal be deemed with prejudice, each party to bear its own fees and costs. Additionally, any defendant who is a party to this Agreement shall cooperate in executing any stipulation, motion or other paperwork necessary to accomplish the dismissal. Should the Court be unwilling or unable to transform its dismissal to one with prejudice, then the parties to this Agreement shall work together to obtain a result equivalent to dismissal of the dispute with prejudice, including, if necessary, the filing of an additional complaint so that it can be dismissed with prejudice. The effective dismissal of the dispute with prejudice is a condition to any performance by Morris & Miller under this agreement. Tullo's counsel shall prepare paperwork for NHC's signature in order to effectuate this provision.

   **3.2 *American Business Funding Liquidation Trust, et al. v. Monteleone, et al.*,** CV2001-019252 (Ariz. Super. Ct., Maricopa Cty.). Upon entry by the Court in the 00-151 matter of an order dismissing that action with prejudice, the plaintiffs in the matter discussed in this paragraph shall promptly file a request for dismissal with prejudice, each party to bear its own fees and costs. Any defendant who is a party to this Agreement shall cooperate in

1470202.1

executing any stipulation, motion or other paperwork necessary to accomplish
the dismissal.

## RELEASES

4.      Other than with respect to their respective obligations and rights
under this Agreement, the Parties intend to end all litigation between them and
to preclude any future litigation between them.  Consistent with this purpose,
and in exchange for the consideration granted in this Agreement, the following
releases are given:

4.1     **Releases By and Between Parties to this Agreement.**
Other than with respect to the ability to assign or enforce the Judgments, the
Parties to this Agreement, with respect to all other Parties, fully and finally
release, discharge and waive any claims, complaints, or rights they have
asserted, could have asserted (whether known or unknown), or that, if asserted,
would be deemed to have arisen from or relate to the same transaction or
occurrences at issue or mentioned in any of the complaints, answers,
counterclaims or cross-claims in any of the specific litigation matters set forth
in paragraphs 1-3 of this Agreement or from any other transactions or events
occurring prior to the date of this Agreement.  This is true regardless of
whether the claim or right sounds in law or equity.  This paragraph should, in
the event of unintended ambiguity or debate, be broadly construed.  However,
nothing in the releases given in this provision or elsewhere in this Agreement
shall abridge the rights of any party to this Agreement to fully enforce this
Agreement in a separate lawsuit.  Nor shall the releases apply to or abridge the
rights of any party with respect to enforcement of any agreement entered into
as of this date or in the future.

4.2     **Releases of Employees, Board Members, Professionals,
Liaisons, Corporate Directors, etc., Who Are Not Parties to this
Agreement.**  The Parties to this Agreement fully release, discharge and waive
any claims they have or may have (whether known or unknown) against each
other's employees, board members, agents, liaisons, directors, advisors or
lawyers that they have asserted or could have asserted as of the Closing Date
of this Agreement.  The scope of this paragraph includes, but is not limited to,
any claims of abuse of process, conspiracy, malicious prosecution, unethical
conduct, intentional infliction of emotional distress, or tortious interference.
This paragraph should, in the event of unintended ambiguity or debate, be
broadly construed.  However, nothing in the releases given in this provision or
elsewhere in this Agreement shall abridge the rights of any party to this
Agreement to fully enforce this Agreement in a separate lawsuit.  Nor shall the

1470202.1

releases apply to or abridge the rights of any party with respect to enforcement of any agreement entered into as of this date or in the future.

4.3     **Release of Others**.  The releases given in paragraphs 4.1 and 4.2 apply fully to release, discharge and waive any claims (whether known or unknown) that any party may have as of the date of closing against YP.Net, Inc., Commercial Finance Services, Inc., Crusader Factors, Inc., Sunbelt Financial Concepts, Inc., Mathew & Markson, Ltd., Murray Bell, Craig or Lorraine Brosnan, Joseph C. or Sandy McDaniel, Joseph C. McDaniel P.C., Gregory Crane, William Kujat, Lori Orner, Ronald Roeske, Ben, Ken or Dennis Schaub, and Peter Strojnik.  NHC, IPA, the Liquidation Trust, the American Foundation for Charitable Support and Atencio further agree not to prosecute any claim whatsoever against any person or entity, whether or not a party to this Agreement, related to or arising out of the transaction or occurrences at issue or mentioned in any of the complaints, answers, counterclaims or cross-claims in any of the specific litigation matters set forth in paragraphs 1, 2, and 3 of this agreement.  Roeske shall execute the Mutual Release and Non-Disparagement Agreement attached as Schedule 4.3 to this Agreement.  However, nothing in the releases given in this provision or elsewhere in this Agreement shall abridge the rights of any party to this Agreement to fully enforce this Agreement in a separate lawsuit.  Nor shall the releases apply to or abridge the rights of any party with respect to enforcement of any agreement entered into as of this date forward.

4.4     **Opportunity to Investigate and Consult**.  The parties, in giving the releases called for in this Agreement, do so knowingly and willfully. Each signatory to the Agreement hereby affirms that s/he or it has had the opportunity and the resources to consult with independent counsel or other professionals before executing this Agreement and has either done so or knowingly waived the right to do so.

## COOPERATION

5.     **Execution of Documents**.  The parties shall work together promptly and in good faith to prepare, execute and file all papers necessary to end all the various pieces of litigation addressed in this Agreement.  The plaintiff in each suit shall be responsible for preparing the dismissal papers.

1470202.1

## MISCELLANEOUS

6.    **Miscellaneous**.

6.1    **Entire Agreement**.  All the terms of this Agreement are expressly set forth herein and may not be supplemented, modified, or deleted except with the express written consent of all parties.

6.2    **Choice of Law and Venue**.  This Agreement shall be governed by Arizona law and all parties to the Agreement consent to personal jurisdiction and venue in the courts, federal and state, located within Arizona. Morris & Miller, Ltd. hereby expressly covenants that service of process may be served upon it for matters related to enforcement of this Agreement through service upon either Gregory Crane or the law firm of Fennemore Craig PC.

6.3    **Execution in Counterparts**.  This Agreement may be executed in separately signed counterparts, which together shall form the full Agreement.  Counsel for NHC and Tullo shall distribute to all parties copies of the Agreement with signature pages from all parties.

6.4    **Non-Disparagement**.  The parties to this Agreement agree to take no action to disparage one another.  The corporate entities who are parties to this Agreement agree to caution their officers, lawyer snad members to refrain from any disparaging remarks or conduct.  This provision shall not apply with respect to the provision of any testimony or information a party is required by law to give or with respect to any party's ability to defend itself in relation to any civil or criminal proceeding.

6.5    **Funds in Trust**.  NHC was ordered by the Court in Adv. No. 00-151 to place $10,000 in the LaVelle & LaVelle trust account.  NHC has already issued a 1099 regarding those funds.  NHC formally relinquishes any right to any portion of the $10,000 currently held in trust by LaVelle & LaVelle.

6.6    **Authority to Sign**.  By signing below, the signor warrants and represents that he has the legal authority to enter into and to execute this agreement on behalf of the entity for which he or she is signing. Notwithstanding the warranty and representation in the prior sentence, the Parties dispute who presently owns and controls or can otherwise enter into an agreement on behalf of, the following entities:  (1) American Business Funding Investors Corp.; (2) American Business Factors, Inc.; (3) Angene, Inc.; (4) Business Equipment Leasing and Finance Corp.; (5) Business Insurance Plus;

1470202.1

(6) GRM, Inc.; (7) HVAC Depot, Inc.; (8) Corporate Business Solutions, Inc.;
(9) MB Holdings, LLC; (10) MMCB Holdings, LLC; (11) Rainbow Insurance
Preferred Group; (12) Reliable Communications, Inc.; and (13) Salesmasters
Wholesale Business Consultants, Inc.  Monteleone claims he transferred any
interest or right he had in these entities to NHC or its predecessor through a
transaction involving Xerxes, Inc.  NHC neither confirms nor denies the
accuracy of Monteleone's claim.  To the extent they have any ownership in or
control over any of these entities, all Parties to this Agreement grant the
Releases given in this Agreement, including but not limited to the waiver of
any right to appeal any aspect of Adv. 00-151.  With these qualifications,
Monteleone agrees to sign on behalf of the thirteen entities listed earlier in this
section.


## SIGNATURES

Entered into this _____ day of December 2003


_____

American Business Funding Liquidation Trust (the "Liquidation
Trust").

By _____  its  _____


_____

American Foundation for Charitable Support, Inc.

By _____  its  _____


_____

American Business Funding Investors Corp.

By _____  its  _____

1470202.1

American Business Factors, Inc.

By _____   its _____

Angene, Inc.

By _____

Eric Atencio.

Joni Atencio

Business Equipment Leasing and Financing Corp.

By _____

Business Insurance Plus.

By _____

Brite Baby USA, Inc.

By _____   its _____

_____

Audrey Brosnan.


_____

Robert Brosnan.


_____

GRM, Inc.

By _____


_____

HVAC Depot, Inc.

By _____


_____

Investment Planners of America, Inc. ("IPA").

By _____   its _____


_____

Corporate Business Solutions, Inc.

By _____


_____

Margaret Molter.


10

1470302.1

MB Holding LLC.

By _____


MMCB Holdings, LLC ("MMCB").

By _____


Morris & Miller Ltd.

By _____     its _____


Gene and Julia Monteleone and the Monteleone Family Trust
(together "Monteleone").

By _____     its _____


Julia Monteleone


New Horizon Capital, LLC ("NHC").

By _____     its _____

1470292.1

_____

**Rainbow Insurance Preferred Group.**

By _____

_____

**Reliable Communications Inc.**

By _____

_____

**Salesmasters Wholesale Business Consultants, Inc. ("Salesmasters").**

By _____

_____

**Angelo Tullo.**

_____

**Debra Tullo.**

12

(6) GRM, Inc.; (7) HVAC Depot, Inc.; (8) Corporate Business Solutions, Inc.; (9) MB Holdings, LLC; (10) MMCB Holdings, LLC; (11) Rainbow Insurance Preferred Group; (12) Reliable Communications, Inc.; and (13) Salesmasters Wholesale Business Consultants, Inc. Monteleone claims he transferred any interest or right he had in these entities to NHC or its predecessor through a transaction involving Xerxes, Inc. NHC neither confirms nor denies the accuracy of Monteleone's claim. To the extent they have any ownership in or control over any of these entities, all Parties to this Agreement grant the Releases given in this Agreement, including but not limited to the waiver of any right to appeal any aspect of Adv. 00-151. With these qualifications, Monteleone agrees to sign on behalf of the thirteen entities listed earlier in this section.


## SIGNATURES

Entered into this  16th  day of December 2003

American Business Funding Liquidation Trust (the "Liquidation Trust").

By DENNIS SCHANB its      Trustee


American Foundation for Charitable Support, Inc.

By _____ its _____


American Business Funding Investors Corp.

By _____ its _____


8

1470202.1

MB Holding LLC.

By _____


MMCB Holdings, LLC ("MMCB").

By _____


Morris & Miller Ltd.

By _____ its _____


Gene and Julia Monteleone and the Monteleone Family Trust
(together "Monteleone").

By _____ its _____


Julia Monteleone

New Horizon Capital, LLC ("NHC").

By _Dennis Schanb_ its _Chairman, Board of Directors_

11

1470282.1

CHARLES R. BERRY
MARC D. BLONSTEIN
KURT M. BRUECKNER
DAVID A. FITZGERALD
WENDY E. GIBERTI
TODD M. JOHNSON
MATTHEW D. LEVINE
MICHAEL B PATTERSON
JOHN R. TELLIER
JON A. TITUS

LAW OFFICES
# TITUS, BRUECKNER & BERRY
A PROFESSIONAL CORPORATION

SCOTTSDALE CENTRE
7373 NORTH SCOTTSDALE ROAD, SUITE B-252
SCOTTSDALE, ARIZONA 85253-3527

April 8, 2004

TELEPHONE 480.483.9600
FACSIMILE 480.483.3215
E-MAIL general@rbb-law.com
WEB www.rbb-law.com

Mr. Howard D. Sukenic
Office of the United States Attorney
40 N. Central Avenue, Suite 1200
Phoenix, Arizona 85004-448

　　　　　Re:　　New Horizon Capital, LLC
　　　　　　　　Fka American Business Funding Corp.

Dear Mr. Sukenic:

　　　　We represent New Horizon Capital, LLC ("NHC"). As you may know, NHC, represented by its prior attorneys, was involved for years in litigation and bankruptcy proceedings arising out of the fall of its predecessor, the American Business Funding Corporation ("ABF"). This litigation involved numerous actions against many different individuals and entities.

　　　　Late in 2003, NHC resolved what it expects (and certainly hopes) to be the last of these litigation matters in a settlement that included resolution of NHC's claims against, among others, Angelo Tullo, an ABF principal who never admitted any intentional role in wrongdoing at NHC.

　　　　NHC is ready to put these matters behind it. The resolution of this hard-fought case was reached only after substantial negotiation, exchanges of information and NHC's extensive review of the circumstances of all of the ABF matters. After several long and difficult years, NHC is tired of rehashing and being involved in proceedings related to ABF, and wants to devote its energy to more positive efforts, including the expansion of its business. NHC's members and management want to get on with their lives.

　　　　Quite simply, NHC no longer wants to be involved in any prosecution related to Tullo and ABF, as that prosecution would be time-consuming, negative, and, as far as NHC is concerned, cumulative and unnecessary at this point. Were Tullo to be prosecuted, NHC and its members would not ask for, or claim entitlement to, any restitution award. In fact, NHC and a majority of its members would prefer that Tullo *not* be prosecuted.

　　　　NHC's battles with Tullo and other defendants were difficult and extremely time-consuming. But during the settlement process, the parties exchanged substantial information, and, NHC believes, engaged in productive discussions. Moreover, the settlement structure negotiated by the parties places some good faith by NHC and its members on Tullo's future

Mr. Howard D. Sukanic
Office of the United States Attorney
April 8, 2004
Page 2

work-related efforts. In response to these changed circumstances, this letter is intended to clarify the position of NHC vis-à-vis the investigation your office has been pursuing into ABF and Tuilo. NHC understands its duty to cooperate with your office upon request, and NHC certainly intends to do so. This communication is simply an expression of NHC's desires.

Very truly yours,

TITUS, BRUECKNER & BERRY, P.C.

Charles R. Berry

AGREED:

AMERICAN FOUNDATION FOR CHARITABLE SUPPORT

By: _____

Name: _Ben L. Shaub_

Its: _President_

AMERICAN BUSINESS FUNDING LIQUIDATION TRUST

By: _____

Name: _DENNIS SCHLAUB_

Its: _TRUSTEE_

H:\6724\sukanic1.DOC

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement is by and between the following parties:

- New Horizon Capital LLC ("NHC").
- Morris & Miller, Ltd.

## RECITALS

A.     NHC desires further capital and improved cash flow performance. It desires to further these objectives by selling illiquid assets and acquiring more liquid assets.  In addition, current litigation costs have depleted NHC's cash reserves.  For these reasons, NHC is interested in ending all litigation arising out of or related to its litigation against Morris & Miller.

B.     Morris & Miller is interested in acquiring certain assets in NHC's possession and in ending any litigation related to itself or Angelo Tullo.  Tullo is the CEO of YP.Net, a company in which Morris & Miller has a large investment.

## I.     CONSIDERATION TO NHC

## CASH

1.     In exchange for and in purchase of the assets NHC is conveying to Morris & Miller in section II of this Asset Purchase Agreement, Morris & Miller agrees to make the following payments (totaling $2,575,000.00) to NHC or its assignee:

      1.1     **Payment on Closing Date.** On the day on which the relief sought in the Motion is granted by the Bankruptcy Court (the "Closing Date") Morris & Miller shall either wire transfer to NHC one million five hundred thousand dollars ($1,500,000.00) or provide either a cashier's check or certified funds in that amount.  Prior to the Closing Date, NHC shall provide wiring instructions to counsel for Morris & Miller.

      1.2     **Payments in First Quarter 2004.**  In addition to the payment made on the Closing Date, Morris & Miller will make the following payments to NHC through wire transfer:  (a) $275,000.00 by January 31, 2004; (b) $300,000.00 by February 28, 2004; and (c) $500,000.00 by March 31, 2004. Together, these payments in the first quarter of 2004 total one million seventy-five thousand dollars ($1,075,000.00).

1.3    **Assignment of Morris & Miller's Rights to Cash Payments.** Promptly after the execution of this APA, Morris & Miller will deliver to NHC: (a) documents establishing YP.Net's agreement to pay Morris & Miller amounts equivalent or greater than the three Installment Payments ($1,075,000.00) prior to or consistent with the timing of the required timing of the Installment Payments; and (b) an assignment or assignments of Morris & Miller of its right to payment of from YP.Net (up to the amount of the Installment Payments). The form of assignment that Morris & Miller shall deliver to NHC pursuant to this section is attached as Schedule 1.3.

1.4    **Opinion Letters.** Counsel for YP.Net and counsel for Morris & Miller shall provide a legal opinion (the Opinions) that the NHC/Morris & Miller transaction is valid, binding and (as against Morris & Miller and YP.Net) enforceable by NHC under applicable law. The form of Opinions that shall be provided to NHC are attached as Schedules 1.4(a) and 1.4(b).

## RELINQUISHMENT OF CLAIMS AND MEMBERSHIP RIGHTS

2.    In exchange for and in purchase of the assets NHC is conveying to Morris & Miller in section II of this Asset Purchase Agreement, Morris & Miller on the Closing Date shall disclaim any membership interest in NHC, including any membership interest obtained from Audrey and Robert Brosnan.

2.1    **Transfer of Brosnan Interest in NHC to Morris & Miller.** Morris & Miller represents that the Brosnans have assigned, transferred and otherwise fully conveyed their membership rights in NHC to Morris & Miller, subject only to NHC's consent, which NHC hereby gives.

2.2    **Transfer of Interests in NHC to NHC.** On the Closing Date, Morris & Miller shall disclaim, assign, transfer and otherwise fully convey its membership rights in NHC in accordance with the Disclaimer attached as Schedule 2.2. In this regard, Morris & Miller will cause the Brosnans to sign the Disclaimer, and Morris & Miller's disclaimed/transferred interest shall include the interest it acquired from the Brosnans as well as its own. NHC shall cooperate by preparing any additional paperwork necessary to effectuate this relinquishment or transfer.

## STOCK TRANSFER

3.    In exchange for and in purchase of the assets NHC is conveying to Morris & Miller in section II of this Asset Purchase Agreement, Morris & Miller shall convey to NHC the following stock in YP.Net, Inc.:

2

3.1     **Amount of Shares.**  Morris & Miller possesses and agrees to transfer to NHC equity securities in the form of 2.249 million (2,249,000) shares of the common stock of YP.Net, Inc. (the "Shares").

3.2     **Restrictions on Shares.**  The stock certificates evidencing the Shares shall be amended to contain a restriction stating that any voting rights associated with the Shares shall remain with Morris & Miller and shall not be exercisable by NHC or its assigns, so long as Morris & Miller is not in default on any payment obligation imposed by this Asset Purchase Agreement. NHC shall cooperate with Morris & Miller by entering into a separate proxy agreement concerning voting rights on the Shares. The voting restriction and proxy agreement shall, by their terms, expire upon the earlier of (a) May 31, 2005 or (b) contemporaneously with the Bona Fide Sale by NHC of the Shares. A Bona Fide Sale of the Shares means a sale on the market of a national stock exchange. In addition, the stock certificates evidencing the Shares shall be amended to contain a separate restriction that, until the earlier of May 10, 2006 or a Bona Fide Sale of the Shares, Morris & Miller shall have the right to purchase the Shares, in whole or in part, at a price of $2.00 per share so long as Morris & Miller is not in default on any payment obligation imposed by this Asset Purchase Agreement. The restriction regarding Morris & Miller's right to purchase the Shares shall make clear that the restriction vanishes upon a Bona Fide Sale and is not meant to affect NHC's ability to make a Bona Fide Sale of the Shares. To the extent required by law, these Shares shall be subject to Rule 144 restrictions and shall carry with them all appropriate legend restrictions.

3.3     **Put Rights of NHC.**  Unless the Shares shall have been sold in a Bona Fide Sale, NHC shall have the right to require that Morris & Miller repurchase the Shares, in whole or in part, as follows:  (a) on any date between and including January 10, 2005 and June 10, 2005 at a price of $1.25 per share; (b) on any date between and including June 11, 2005 and December 10, 2005 at a price of $1.75 per share; and (c) on any date between December 11, 2005 and May 10, 2006 at a price of $2.00 per share.

3.4     **Release of Restrictions in the Event of Put.**  To exercise the put option, NHC must first attempt, with cooperation from YP.Net, Inc. and Morris & Miller, to lift the Rule 144 legend. If for any reason YP.Net, Inc. does not provide an opinion of counsel sufficient to cause the Transfer Agent to lift the legend, then NHC is released from this requirement and Morris & Miller will honor its put obligation with or without the removal of the legend.

3.5     **Procedure Regarding Put.**  After lifting the legends or making good faith attempt to do so, NHC will give Morris & Miller thirty days

3

prior written notice of its intent to put the Shares to Morris & Miller. The notice shall state the amount of Shares being put, as well as NHC's estimate of the amount of dividends received to date with respect to the Shares. Morris & Miller may then require NHC to tender the stock in electronic format and tender (DWAC) to a neutral third party designated as a paying agent. This neutral third party shall be either a brokerage house, banking institution, or an entity that is an affiliate of either a brokerage house, or banking institution. No later than seven days after the stock is tendered, Morris & Miller shall cause funds to be wired to NHC in an amount sufficient to pay the then existing price of the put Shares (less any dividends received by NHC). NHC shall provide wiring instructions. If for any reason the procedure outlined in the preceding two sentences of this provision cannot be accomplished despite good faith efforts by NHC, NHC shall provide Morris & Miller with a fourteen-day notice that such efforts have failed and, if Morris & Miller is unable to assist NHC in accomplishing the tender in the fourteen-day period, the requirements of these two sentences shall be excused and Morris & Miller shall thereupon honor the put.

      3.6    **Procedure Regarding Buyback**. With respect to a buy back of the Shares by Morris & Miller, the following procedure shall apply. Morris & Miller shall deliver to NHC a written Notice of its Intent to Buy Back Shares. The Notice shall state the amount of Shares Morris & Miller wishes to purchase, as well as Morris & Miller's estimate of the amount of dividends NHC has received to date, which shall serve as an offset to the purchase price. NHC shall then have seven days to respond to Morris & Miller to inform Morris & Miller (a) whether the Shares to be bought back have previously been assigned, sold or otherwise transferred out of NHC's control to a party or party that NHC shall name if the sale was other than a Bona Fide Sale; and (b) the correct amount of dividends NHC has received with respect to the Shares. If, upon receiving the Notice, NHC still owns the Shares to be purchased, Morris & Miller may then require NHC to tender the Shares in electronic format and tender (DWAC) to a neutral third party designated as a paying agent. This neutral third party shall be either a brokerage house, banking institution, or an entity that is an affiliate of either a brokerage house, or banking institution. Funds shall be wired to NHC within ten days after NHC tenders the shares being repurchased, with NHC providing wiring instructions upon request. If for any reason the procedure outlined in this provision proves unworkable or impossible, NHC and Morris & Miller shall communicate about any problems and work together to resolve them.

      3.7    **Dividends**. The Shares shall be subject to the same dividend rights as other common stock. If YP.Net, Inc. declares dividends at any time prior to the expiration of the put and/or buyback periods (whichever is

ordinary course of business transactions involving the granting of stock options or the issuance of YP.Net, Inc. stock for merger or acquisition transactions for as long as the put obligations under this Asset Purchase Agreement are extant. Notwithstanding any other provision in this Asset Purchase Agreement or in the Settlement and Release Agreement between the parties, NHC reserves the right to bring any appropriate derivative action so long as such action is related <u>solely</u> to any complaint about improper dilution and does not raise or address any matters or facts related to Adv. No. 00-151.

## II.    CONSIDERATION TO MORRIS & MILLER

4.    In exchange for and to purchase the assets Morris & Miller is providing under this Asset Purchase Agreement, NHC agrees to convey its rights in the following claims, judgments and settlement agreements to Morris & Miller, which Morris & Miller believes are of significant value:

4.1    **Claims.** NHC currently has claims pending against Performance Funding LLC, Performance Industries, Inc., Performance Funding, Inc., Lou and Susan Wallace, Mark and Jane Doe Sippel, Pacific Business Capital Corporation, and William and Jane Doe Gibney arising out of the basic facts set forth in the pleadings in Adv. Nos. 00-151, 02-136 and 02-1360. NHC hereby unconditionally transfers all such claims it has or may have against those individuals or entities, whether known or unknown, asserted or unasserted, to Morris & Miller, and waives the right to any further recourse or participation in any recovery. If necessary, NHC agrees to cooperate so that Morris & Miller may substitute itself into any litigation regarding those claims. NHC agrees to pursue no further claims against individuals or entities arising out of or related to the basic facts and transactions alleged in Adv. Nos. 00-151, 02-136 or 02-1360.

4.2    **Judgments.** As explained in a subsequent section, a condition precedent to performance under this Asset Purchase Agreement is bankruptcy court approval of a Settlement and Release Agreement executed on the same date as this Asset Purchase Agreement (the "Settlement and Release Agreement"). Under that Settlement and Release Agreement, NHC shall be entitled to have judgments entered in the following amounts:

- GRM, Inc. ($128,857.33).
- MMCB Holdings, Inc. ($561,931.07).
- Salesmasters Wholesale Business Consultants, Inc. ($2,154,238.84).
- HVAC Depot, Inc. ($2,522,181.50)
- Gene Monteleone ($7,000,000.00).

- Total: **$12,367,208.74.**

NHC agrees that, within five days after the Closing Date, it shall promptly assign all rights it has under these judgments to the maximum extent allowed by law to Morris & Miller. NHC shall prepare and present formal assignments in a form consistent with this provision and to the reasonable satisfaction of Morris & Miller. With respect to the Judgment against Monteleone, Morris & Miller acknowledges that it is subject to the conditions and restrictions set forth in the December __, 2003 agreement between Monteleone and Morris & Miller, a copy of which is attached hereto as Schedule 4.2.

4.3     **Settlement Agreements.** In the course of its bankruptcy proceedings, NHC entered into settlement agreements with the following individuals: Roseanne Boling, Conrad Kockerbeck, Alan Guttentag, James Nova, Richard Masharella, John Wolfe and Joseph C. McDaniel. NHC agrees that, within five days after the Closing Date, it shall promptly assign all rights it has under these settlement agreements, including but not limited to the right to any cash owed but not yet paid under the agreements as of December 1, 2003, to the maximum extent allowed by law to Morris & Miller. NHC represents that it has not forgiven any debt or obligation called for by the terms of those settlement agreements, except for agreeing to a short-term forbearance agreement with Guttentag. NHC shall prepare and present formal assignments in a form consistent with this provision and to the reasonable satisfaction of Morris & Miller.

4.4     **Severability.** To the extent the assignment of any portion of the claims, judgments or settlement agreements identified in this section is deemed illegal or otherwise unenforceable, the remainder of the assignments shall survive and be valid to the maximum extent permitted by law.

## III.     COOPERATION RE: TULLO AND YP.NET

5.     The parties to this Asset Purchase Agreement acknowledge that the stock of YP.Net, Inc. is valuable, that said value has been enhanced substantially during Angelo Tullo's tenure as Chairman of YP.Net, Inc. In order to clarify issues NHC has raised regarding YP.Net and its Chief Executive Officer, Angelo Tullo, NHC agrees to the following:

5.1     **Unproven Allegations and Reliance on Questionable Witnesses.** NHC acknowledges that some of its allegations against Morris & Miller, Greg Crane, Tullo and YP.Net turned out to be either untrue or not provable and that those and other allegations were based on the testimony and input of individuals that NHC acknowledges to have credibility problems and to

be persons of questionable character. NHC acknowledges uncertainties regarding its claims, its evidence and its damages.

      **5.2**     **Cooperation By NHC, the American Foundation for Charitable Support and the Liquidation Trust.** Based on their interest in YP.Net, the satisfactory resolution of their claims, and upon further clarity gleaned from reflection on their reliance on witnesses with questionable credibility and character, NHC, the American Foundation for Charitable Support and the ABF Liquidation Trust all agree to, upon request, approach, via letter, prosecuting authorities on Tullo's behalf. A form of letter is attached as Schedule 5.2. More specifically, they agree to inform prosecuting authorities, via letter, that their claims against Tullo have been resolved to their satisfaction, that they (or those they control) would not seek further restitution in any criminal action, and that, for a variety of reasons including their desire to end participation in litigation, they would prefer Tullo not be prosecuted. By signing this Agreement, they affirm that these are, indeed, their beliefs and desire. Moreover, NHC and the American Foundation for Charitable Support agree to use their best efforts to obtain signatures on the letter from other investors in or directors of NHC, specifically, Murray Bell, Bill Kujat, Ron Roeske and Crusader Factors. Should NHC and the American Foundation for Charitable Support fail to obtain all such statements by 5:00 p.m. on December 23, Morris & Miller shall have the right to elect to void this entire Asset Purchase Agreement for failure of a condition precedent. Morris & Miller shall promptly inform NHC of its election by December 24 at 3:00 p.m.

      **5.3**     **Cooperation in Any Future Litigation or Investigation.** Subject to payment of reasonable compensation, including costs, NHC agrees to cooperate with Morris & Miller, Tullo, or YP.Net or their counsel in any future litigation, whether civil or criminal, including any preceding investigation, arising directly or indirectly out of the ABF bankruptcy. Specifically, NHC (including its experts, consultants and its counsel) shall provide access to documents, files, witnesses (expert or otherwise) and other information in their possession or control and make available their thoughts about the roles of others with respect to any improprieties that occurred at ABF. Nothing, however, in this Asset Purchase Agreement shall require NHC to disclose any document or information protected by the attorney-client privilege. NHC's duty to provide such cooperation is conditioned upon Morris & Miller not being in material breach of its obligations under this Asset Purchase Agreement.

      **5.4**     **Joint Press Release.** Upon request by Morris & Miller, NHC agrees to a joint press release with YP.Net or Morris & Miller solely to disclose the basic terms of this Asset Purchase Agreement and the Settlement and Release Agreement to help correct any negative publicity that may have

o

occurred due to NHC's claims against Morris & Miller (one of YP.Net, Inc.'s largest shareholder) or Tullo (YP.Net's CEO). Any such press release shall be prepared in conjunction with Eric Atencio, NHC's Managing Member, and a designated officer of YP.Net, Inc. Disagreement between the parties as to the content of the press release shall not be deemed a material breach of the Agreement entitling Morris & Miller to withhold or suspend performance.

## III.   MISCELLANEOUS

6.      Except as otherwise noted in this Asset Purchase Agreement, the parties to this Asset Purchase Agreement wish to keep confidential all terms of the Agreement as well as the Agreement itself.

6.1    **Non-Disclosure.**  The parties shall not disclose the terms or details of this Asset Purchase Agreement. Any party may, however, disclose the existence of the Asset Purchase Agreement or its terms to their lawyers, accountants or other professionals as necessary and may honor any true compulsion of law regarding disclosure. Any subpoena or formal investigative demand that is received either by NHC on the one hand, or Morris & Miller on the other, related either to this Agreement or to any alleged improprieties at ABF, shall immediately be forwarded to the other side prior to disclosure.

7.      **Non-Disparagement.**  NHC agrees to take no action to disparage Tullo, Morris & Miller, Greg Crane, or YP.Net. Morris & Miller agrees to take no action to disparage NHC. NHC and Morris & Miller shall take steps to caution their officers, lawyers and members to refrain from any such disparaging remarks or conduct.

8.      **Choice of Law and Venue.**  This Agreement shall be governed by Arizona law and all parties to this Asset Purchase Agreement consent to personal jurisdiction and venue in courts located within Arizona. Morris & Miller expressly agrees that service of process may be served upon it for matters related to enforcement of this Asset Purchase Agreement through service upon either Gregory Crane or the law firm of Fennemore Craig P.C. (attn: James Trimble, Esq.). Crane will execute a form of acknowledgement that he has reviewed this Agreement, he is authorized to accept service for Morris & Miller with respect to the Agreement, and he in fact agrees to accept service on behalf of Morris & Miller pursuant to this Section 8.

9.      **Entire Agreement.**  All the terms of this Asset Purchase Agreement are expressly set forth herein and may not be supplemented, modified, or deleted except with the express written consent of the parties.

10.     **Execution in Counterparts.** This Asset Purchase Agreement may be executed in separately signed counterparts, which together shall form the full Asset Purchase Agreement. The parties will sign this Asset Purchase Agreement in the presence of a notary public.

11.     **Dates.** To the extent any dates or deadlines set in this Asset Purchase Agreement fall on a weekend or federal holiday, the date or deadline shall be extended to the next business day.

12.     **Authority to Sign.** By signing below, the respective representatives of NHC and Morris & Miller each warrant and represent that they have the legal authority to enter into and to execute this Agreement on behalf of the entity for which he or she is signing, and further acknowledges that the other party is relying upon such warranty and representation.

13.     **Capitalized Terms.** Unless otherwise indicated, any capitalized terms in this Asset Purchase Agreement are intended to correspond to the capitalized terms used in the Settlement and Release Agreement.

## IV.   CLOSING DATE

This Asset Purchase Agreement, though executed, is subject to an overarching condition precedent before it closes and becomes effective.

14.     **Bankruptcy Court Approval.** All parties agree that it is a condition precedent to all obligations imposed by this Asset Purchase Agreement that the Bankruptcy Court in Adv. 00-151 shall first approve the Settlement and Release Agreement and do so strictly consistent with the terms of that Agreement. If the Bankruptcy Court fails to do so, this Asset Purchase Agreement shall fail to close and become effective and be of no legal consequence whatsoever, with all parties having no obligations thereunder except, if necessary, to work together to unwind any steps that have been made towards performance under this Asset Purchase Agreement.

14.1    **Closing After Bankruptcy Court Approval.** This Asset Purchase Agreement shall become effective immediately upon issuance by the Bankruptcy Court of the orders and judgments required by the Settlement and Release Agreement, provided, however, that those orders and judgments are strictly consistent with the orders and judgements expressly contemplated in the Settlement and Release Agreement.

## V.  NOTICE

Any notice required under this agreement shall be deemed completed upon receipt of certified mail addressed to the parties as set forth below:

If to NHC:

> John Clemency, Esq.
> Greenberg Traurig LLP
> 2375 East Camelback Rd, Suite 700
> Phoenix, Arizona 85016-9000

> Scott Goldberg, Esq.
> Quarles & Brady Streich Lang LLP
> Two North Central Avenue
> Phoenix, Arizona 85004-2391

If to Morris and Miller, Ltd.:

> James J. Trimble, Esq.
> Fennemore Craig P.C.
> 3003 North Central Avenue 2600
> Phoenix, Arizona 85011-2913

> Gregory Crane
> 4840 East Jasmine, Suite 110
> Mesa, Arizona 85025

This Counterpart Signature Page for the Asset Purchase Agreement Dated this ___ day of December 2003 is signed by:


_____
New Horizon Capital, LLC

By Dennis Schaub   its  Chairman of the Board


ACKNOWLEDGED before me this ___ day of December, 2003.


_____
Witness

This Counterpart Signature Page for the Asset Purchase Agreement Dated this 17th day of December 2003 is signed by:

_____
Morris & Miller, Ltd.
By: Ilse Cooper, AMT Director Antigua

ACKNOWLEDGED before me this 17 day of December, 2003.

_____
Witness

MB Holding LLC.

By _____


MMCB Holdings, LLC ("MMCB").

By _____


_Ilse F. Cooper_
Morris & Miller Ltd.

By _ILSE COOPER_ its _DIRECTOR_


Gene and Julia Monteleone and the Monteleone Family Trust
(together "Monteleone").

By _____ its _____


_____
Julia Monteleone


_Dennis Schaub_
New Horizon Capital, LLC ("NHC").

By _DENNIS SCHAUB_ its _CHAIRMAN, BOARD OF DIRECTORS_

11

## ACKNOWLEDGEMENT

I, Charles George Henry, Notary Public in Antigua and Barbuda, do hereby certify that ILSE F. COOPER, in her capacity as Director of ANTIGUA MANAGEMENT & TRUST LTD., Woods Centre, Friar's Hill Road, St. John's, Antigua, personally known to me to be the same person whose name is subscribed to in the foregoing instrument, appeared before me this day in person and acknowledged that she signed and delivered the said instrument as her own free and voluntary act for the use and purpose therein set forth.

Given under my oath and notarial seal,
this 18th day of December, 2003

...............................................
Charles George Henry
Notary Public

*Charles G. Henry*
**NOTARY PUBLIC**
**ST. JOHNS ANTIGUA, W.I.**

## ACKNOWLEDGEMENT

I, Charles George Henry, Notary Public in Antigua and Barbuda, do hereby certify that ILSE F. COOPER, in her capacity as Director of ANTIGUA MANAGEMENT & TRUST LTD., Woods Centre, Friar's Hill Road, St. John's, Antigua, personally known to me to be the same person whose name is subscribed to in the foregoing instrument, appeared before me this day in person and acknowledged that she signed and delivered the said instrument as her own free and voluntary act for the use and purpose therein set forth.

Given under my oath and notarial seal,

this 18th day of December, 2003

..................................................
Charles George Henry
Notary Public

*Charles G. Henry*
**NOTARY PUBLIC**
*ST. JOHNS ANTIGUA, W.I.*